Case number 23-12-22, Peabody Midwest Mining, LLC and Michael Butler employed by Peabody Midwest Mining, LLC petitioners versus Secretary of Labor, Mine Safety and Health Administration, MSHA, and Federal Mine Safety and Health Review Commission. Mr. Moore for the petitioners, Ms. Maltz for the respondents. May it please the court. The case involves a number of issues, but it comes down to whether or not the two violations that the commission found were properly designated as unwarrantable and whether or not individual felonies should have been assessed against Mr. Butler. Recognize what we have here. We are dealing with the actions of a mine foreman when a drilling crew was willing to find a location of another mine if it was adjacent to or too close to the mine. He was called to the area. He had no idea what he was getting into. When he walked in, there was noise because the air was coming out of the borehole. He did not expect what was occurring. He had taken a maintenance foreman with him because he thought there was a problem with the drill. When he got there, he came into the area, in by, and if I confuse anybody with in by and out by, please let me know. We did define it, but essentially it's a directional term. He came into the area, in by the drill, and walked up to the driller and said, what have we got here? Driller told him, and he said, what's the procedure? And he said, plug the hole. But what he did at that point is let the driller and his assistant try to go ahead and plug the hole. And what he did, and at that point, they were already starting the process of pulling drill seals out of the hole so they can push a plug in. Mr. Moore, if you could just help me to understand some of the terminology here. Is it your position that the action of plugging the borehole is a type of ventilation work? Yes, it is. Because while you don't typically, if you're up at the face of the mine and you have excessive methane, you can't do anything to stop that. But in this case, you can prevent the methane from coming into the airstream. So it is in fact ventilation. Is it ventilation work in the meaning of the regulation? I mean, I understand it's an action designed to lower the levels of methane, but is it ventilation work? Well, when you are doing ventilation work, you're doing any number of things. You are putting up curtains to direct air, you're putting up stoppings to separate airways. If you are dealing with areas of the mine that are sealed, you may well be installing seals, additional seals. If you are dealing with an area behind, which we don't have here, a longwall panel, you may be doing things to prevent methane coming out of the area behind the longwall panel into the airstream in the mine. So in that sense, if you're stopping methane, you don't normally have the chance to stop methane, but if you are stopping methane as you would, for example, coming out of a longwall gun, it's the same thing as I see. So ventilation in your reading includes plugging. Includes plugging in this instance. Now recognize, of course, this is an unusual case and the application of these standards to this are unusual. And that's the part of the problem with it. It may be an unusual case, but the regulation seems just very clear. I mean, the one thing you have to do when the methane level exceeds 1.5% is shut down the electrical. Well, okay, when they got- You might have an argument that there's some atextual defense that if you have to violate the rule in the interest of safety, you can do it, but I don't see any argument that- Well, it's interesting because I was looking at, this involves 75.323.C.2. C.1. Which is just- C.2.Romana.2. Yes. It says shut off the electrical. Well, yes, but it's the collective C.2. But C.1 says if methane's over 1%, you're supposed to make changes and adjustments to ventilation. How you factor that in with C.2 is an interesting question because of the reference to other work. It is interesting because- C.1 is the one that's when it's 1% or more. 1% or more. Right. So it's 1% or more. So within that, if it's at non-dangerous, but potentially mounting, then you make adjustments. But then 1.5, whether C.1 applies up above 1.5 or not, C.2 is clear. I think as Judge Katsas was saying that everyone shall be withdrawn, power shall be disconnected, and no other work other than withdrawing people and disconnecting power can occur until the methane concentration is less than 1%. Everyone should be withdrawn except those who are permitted to remain in order to eliminate the hazard. Well, except those who are working to withdraw people and turn off power, I think is how the commission reads it, right? That's the way I read it. But there is the C.1, excuse me, C.2 single I that says the people who are working to eliminate the hazard may remain in the area. And let's take the situation. They de-energize the drill and then remove everybody except those people who might be necessary to address the hazard. They could stand there and they can monitor it. We know that the methane was going up and down and they could stand there and monitor it. If it were not under 1%, they could then fire up the drill and go back to what they were doing. And the interesting thing is, while we keep talking about the commission and the secretary talk about 5%, we know it wasn't 5% most of the time because the drill would shut down at 2%. And in fact, the inspector said when they were trying to plug the hole and they were drilling, it was probably 1.1 to 1.2%. So we have, we know that for at least 1% at least a period where they were pulling most of the drill spill, the methane was under 2%. We don't know exactly what it was. We have the judge saying he can't tell how long it was above 1.5%. So we have a situation that they're trying to deal with. Now, the inconsistency that we have in this case is the judge says what Mr. Butler was doing was laudable, admirable, and he did it in good faith. And yet same judge and the commission then turn around and say, well, yeah, it was all those things, but it was aggravated conduct. Well, because commission precedent only recognizes a defense where an operator has a good faith and reasonable belief that the cited conduct is the safest method of compliance. And I think that, you know, the LJ is recognizing people to make mistakes, but that it is still a mistake in the sense that it's not reasonable under the regulations. Well, I would disagree that it was unreasonable for two reasons. One is they're trying to prevent a greater hazard. How so? The hazard is measured with respect to miners. How is it a greater hazard to turn everything off and leave? What's the hazard to humans? Well, that means methane will keep pouring out. Right, with nobody around. Well, yes and no. Because, all right, you evacuate the mine. Let's say the methane goes out in the return and does what the inspector thought it might do, which is get sucked back into the mine on the intake because both the intake and the return terminate out in the pit. And I'm sorry, because we are taking the limited time. You said he's acting to avoid a greater hazard. And really the question I have for you on that point is there are these two different defenses, the greater hazard defense and the diminution of safety issue. And you objected to diminution of safety because that requires a filing or a contact with an insurer that you claim was unreasonable. But the greater hazard seems to me to be the way around that cumbersome procedural requirement. But it also, A, I didn't see you raising that meaningfully before the commission. And B, even if you had, you have to argue that all the elements of that are met. And I don't think you've met them here. Well, first of all, I think diminution of safety defense and the greater hazard defense really are one and the same. Because if I think application of the standard diminishes safety, that means there's a hazard from application of standard that is frankly greater than what they're trying to do. Well, so if they're the same, then there's precedent that the defense requires that the process be modified because the hazards of compliance are greater than the hazards of the proposed non-complying action. And that there's no alternative means to protect minor safety. And here the question is, why is it not a means of protecting minor safety to evacuate everybody and turn everything off? Well, the means available to protect minor safety were what they were doing, which was putting more air over the air that was coming out of the borehole. And they did that by redirecting it with a curtain and also by taking the air from the adjacent entry and directing it over to the drill area so there would be a full amount of air coming through there. They also, they had the people from the adjacent section leave. Was there coal production going on that night? It was unclear to me. If there was coal production, you should understand the drill is in the zero entry and you would to get to the section, you would go over three or four entries to get to the travel way into the section. There was coal production. And in fact, it was in by where the drill was working. Now, it's not coal production. They pulled the equipment back. They de-energized it and they de-energized it, pulled the power out of it. So if the plugging had been effective that night, presumably they could have brought the people back. Was it in zone three? If the plugging had been effective, and that people had been evacuated from the mine, while it's not necessarily clear from 75, 360 and 361 and two you would have done an examination of the mine. Now I will tell you practically what would have happened. This happened at two o'clock in the morning. The normal pre-shift for the next shift starts at five o'clock. They wouldn't have brought those people back. If they had plugged it. Now, let me also say, particularly with respect to Mr. Parker, he happened to be in the adjacent section. He was only a couple entries away. If he had been in the other section and they called him there and he'd come over, probably they would have had it plugged by the time he got without the things that he directed be done. It's happenstance. He did what he thought was the best thing to do. And obviously the commission disagreed, but looking at it, there should be consideration for the fact that he acted in good faith, though they disagree with it. And what he did was characterized as good. Right. And I mean, these are not easy jobs. With respect to Mr. Butler's personal liability, you're not challenging the ALJ's application of the knowingly standard in North Shore Mining. No, we are not. On unwarranted- I think North Shore was wrong, but I'll- You're not challenging it here. Yes, that's not good. On the unwarrantable failure, which requires some relatively high degree of culpability, does the inquiry focus on the reasonableness of how Mr. Butler read the regulation or the reasonableness of his safety judgments or both? I think it has to be both. I mean, I haven't thought of what is required is aggravated conduct, which is more than ordinary negligence. These two orders were designated high negligence, but as I looked at Freeman, I'm saying to myself, well, I'm not sure that that's enough. But having said that, I think the reasonableness of what he did and the reasonableness of the circumstance. And I assume you're giving me the same answer as to Butler's individual liability to the extent that there's a good faith difference. I think you need a little bit more than aggravated conduct. Thank you. Mr. Moore, you mentioned in your brief and you also mentioned today that REI was in charge of the horizontal drilling and Mr. Butler asked them their view. Would Mr. Butler or Peabody have an indemnification claim against REI? No, no. I mean, REI as an independent contractor stands in the same set as Peabody. They are an operator as an independent contractor. And in this case, REI was a specialist. And they were also, action was brought against, enforcement was brought against them too. Yes. And that's been resolved. They, Mr. Farron was the one who was familiar with the plan, Mr. Butler, because he's normally involved with other things. He's not, was not familiar with it. Mr. Farron testified that he thought he was complying with the plan. Said it turned out it wasn't, but, and they changed his plan afterwards. So that, but anyway, but he wasn't charged. Mr. Farron was not charged individually, even though as a sole representative or by any legal definition of agent, he was. Thank you. Thank you, Mr. Moore. We'll give you a little bit of time, if you want it. Morning, Ms. Maltz. Good morning. Good morning, may it please the court. Susanna Maltz for the secretary of labor. A little bit difficult to hear you. You might bring the microphone. Could you guys speak up? Sure, absolutely. How's this? Better. Okay. You can also bring the side microphones in. There's a lot because our system is not terrific. Understood. Okay, please let me know if I quiet down. We've heard today that in Peabody Zoo, this was an unusual emergency situation. All the more reason to comply with the safety standards. The standards apply regardless of whether or not the situation's unusual, and they certainly apply in an emergency. I'll pick up where my colleague left off on the subject of the unwarrantables, unless the court prefers otherwise. Just a question, whether it's the agency's view that ventilation work includes bugging a borehole. Is there a term of art meaning to work what ventilation work includes? Well, it's the agency's view that it doesn't matter whether in that case, it doesn't matter whether ventilation includes plugging the borehole, because the standard doesn't allow ventilation work when methane is at 1.5% or more in the return stream of air. But insofar as Peabody argues that plugging the borehole constituted ventilation, the judge found as a matter of fact, that it wasn't ventilation. And it's the agency's view that that finding is supported by substantial evidence. That's correct. I think typically ventilation adjustments involve directing airflow in the mine, constructing temporary barriers to move air. And obviously, I think Peabody's focused on its attempts to eliminate the methane. And I think that encapsulates Peabody's wrongful approach here. Addressing the methane should not have been Peabody's goal. Peabody's goal should have been compliance with the standard and protecting it. So, but you do think that's a question of fact, whether plugging the borehole is ventilation work? Yes. It's not a legal determination? I think that it's a question of fact and that the judge- And it's supported by substantial evidence? Yes. On the subject of the un-mortals, I apologize, I'm a bit out of order here. Peabody? Do we look, I'm going to ask you the same question. Do we look to the reasonableness of the interpretation or the reasonableness of the safety judgment or both? I, I apologize if I'm misunderstanding the question. In order to determine whether or not there's an appropriate good faith defense to an unwarrantable finding, it's the behavior of the operator, whether or not that behavior was reasonable. I apologize if I'm not addressing the distinction, but here, I think what the judge and the commission reviewed was reasonableness of Mr. Butler's reported reliance on Mr. Farron, the reasonableness of his decision to allow drilling to continue in Hyman. And both the commission and the judge found that no prison operator- Suppose we thought, hypothetically, that it was a very hard question whether you could run the electricity in these circumstances under the reg if you were doing ventilation. And, you know, the greatest legal minds would say, gosh, this is really hard, 5149 question, and Butler's there in the middle of the night having to make the call. Well, Judge Katz- It was sort of like a qualified immunity concept. Is that what we look to? I'm forced to first say that, of course, that would never be the case because the standard is very clear. But conceding that in this hypothetical situation, it's a very, very close question. I think that the reasonableness of it, the standard is a reasonably prudent operator under those circumstances. And so- Reasonable. Reasonably prudent operator under those particular circumstances. So one could take into account the difficulty of making that call, I suppose. But again, that's not the case here. You know, I'm happy to answer other questions on the unwarrantable findings, but I think I've made the point that- The reason I'm asking, we can make our own judgment about the reasonableness of your friend's interpretive position. I mean, we do that under Bauer and Kaiser. We make judgments like that all the time. But if we're talking about the reasonableness of the safety issues, could a reasonable operator have thought that under those unusual emergency circumstances, the best strategy is to try to plug the hole, just feel much less comfortable in my ability to make that judgment? I understand. And I think that the factual underpinnings that the judge relied on in determining that Mr. Butler was not behaving reasonably and that Peabody wasn't reasonable in attempting to plug the borehole rather than evacuating miners and de-energizing equipment and disconnecting it at the source. Those facts sort of compel the conclusion that it's not reasonable. And furthermore, they're supported by substantial evidence. All that's to say, Judge, the commission and the judge have reviewed this and it's their position here that that was unreasonable. I hope that that's how- They found, I should have this at my fingertips and I don't, I'm sorry. But commission found that this was less safe, trying to plug the hole was less safe than evacuating. Yes. Did they find that safety judgment was unreasonable? Yes. Yes. And just to draw attention to that fact, it was less safe than compliance with the standard because it created the hazard. The running the drill introduced the ignition source into the high methane. And so in Peabody's purported effort to stem the flow of the methane, Peabody continued to create more hazard by introducing the energy into the high methane atmosphere. I have a question about whether there's daylight between the secretary's view and the commission's view of C2-3. You've clearly argued in your brief and you've argued to us today that C2-Romanet-3 prohibits all work other than the de-energization and evacuation mentioned in C2-1 and 2. The commission said, you know, sort of whether or not Romanet-3 prohibits, for example, adjustments to ventilation, and it plainly doesn't allow energized work. Do you think that was incorrect or incomplete or is there any error in the commission's report? No, I wouldn't characterize it as incorrect. I think the commission just declined to sort of reach the interpretive question that the secretary's advancing, which is that the standard only allows the work detailed in subsections little Roman numeral one and little Roman numeral two. Excuse me. But I don't think that it was legal error. It just is that the commission did not reach the full interpretive or declined to reach the interpretive question. And for our part, do we need to go beyond what the commission did? We would ask that you do, yes. Even though it's not necessary to resolve this case. And how about, do we need to resolve whether this is maybe the same thing but differently, but whether the regulation permits ventilation adjustments when methane levels exceed 1.5% in return air supply is actually a different question. Like the question about whether the standards accumulate or whether the 1.5 standard kicks in and displaces. Well, I think that in order to find that 1.5, that the no other work referred to in C2-3 refers only to work, or I'm sorry, refers to work other than evacuation, de-energization and disconnecting. It would involve finding that under C2, or I'm sorry, under C1 at 1%, the requirement, not the option, but the requirement that operators engage in ventilation adjustments for ventilation control when methane is at 1%, or between 1% and 1.5%, I should say. I'm sorry, I've sort of rambled, but in order to find that C2-3's other work prohibition includes ventilation control, it would be required. Right, right. But if going the other way, if Butler and Peabody were to prevail, one would have to accept the more limited view that the commission took, and then also accept that the ability to adjust ventilation carried through when the methane levels exceeded 1.5. If Peabody were to prevail on its theory that this was ventilation. Right, and one would have to find that plugging the hole was ventilation. Yes. So all those three things. Yes, and none of them are. Ms. Maltz, the commission, so the ALJ stated in its opinion that plugging the borehole does not ventilation work, but the commission doesn't make any finding of that sort in its decision, as far as I recall. So how do we as a court think about that question? And can we review the ALJ's finding? Does the commission decision, is it viewed as implicitly endorsing any finding that it doesn't explicitly disclaim? I think that this court's approach to reviewing the ALJ's, in my view, factual finding that plugging the borehole was not ventilation control, it is the same process that the commission would have gone through, which is just reviewing it for substantial. I'm sorry, I can't hear you. But we don't review the ALJ's decision, we review the commission's decision. Yes, but the factual findings that the ALJ made are reviewed by the commission for substantial evidence and by this court then for substantial evidence. Even if they no longer, they don't explicitly review them? Yeah. That's my understanding. Is there a case you have that discusses a review in this circumstance? I apologize, not at my fingertips now. So your view is the ALJ is the fact finder to the extent that the commission doesn't displace the facts that the ALJ found, those are the facts that are implicitly incorporated in the commission's determination? Yes. I can just briefly conclude, I would be remiss if I didn't emphasize what a outrageous, dangerous situation this was. I'll just say that Peabody has suggested that the secretary has been hyperbolic in emphasizing the potential deaths of six minors and it's not hyperbole to say that this circumstance could have resulted in at least six deaths in a horrifying explosion. So I just would like to emphasize that. Thank you. Mr. Moore, if you'd like it, we'll give you a minute for rebuttal. Want to address briefly the whole issue of whether it's ventilation work. If you had a seal along a return airway and it was breached because of roof pressures or something like that and it was sending methane into the return, the repair of that seal would stop methane from coming in. It would be, without a doubt, ventilation work. So in my view, it really isn't any different than plugging a hole. The other comment I had is there are six factors that the commission looks at for unwarrantable. They don't ever say reasonableness one way or the other, just that they looked at extent, duration, degree of danger, obviousness, knowledge of the condition and abatement. And on some of these, as we've set out in our brief, may have said, as it wasn't supported to this extent, but how they were described. So no other questions, thank you very much. Thank you both for your able arguments. The case is submitted.
judges: Pillard, Katsas, Rao